Good morning, Wyatt Golding for the Fallon Paiute-Shoshone Tribe. This case presents a challenge to a geothermal project... Can you get closer to the mic? I'm having difficulty hearing. This case presents a challenge to a geothermal project of extraordinary consequence, a project which will destroy and prohibit access to significant parts of a sacred site visited by the tribe for thousands of years, in which the U.S. Fish and Wildlife Service, the expert agency, has determined is likely to cause the extinction of an endangered species, the Dixie Valley toad. Counsel, that determination is a development that occurred after the appeal was filed in this case. Am I correct on that? That's correct, Your Honor. Has a separate suit been filed in that case? The center and the tribe have sent a notice of intent to sue, which is required under the Endangered Species Act. Okay. And so shortly, that ran yesterday. There's a 60-day waiting period. And so shortly after this hearing, this week... I think as of June 8th, you could file something, right? Thereabouts. We've been focused on this hearing, so we're going to amend the complaint and add the ESA claims. Okay, so you haven't filed that complaint yet, but it's very, very, very likely that you are going to file that complaint. Now, can we take account in this case the fact of the designation by Fish and Wildlife? Yes, Your Honor, for two reasons. One is that the concerns raised by Fish and Wildlife were the same concerns that they put before BLM, before project approval, and that's in the administrative record that's conceded by defendants. Does that mean that you're not putting any additional information into the new lawsuit that you don't have in this lawsuit? I'm trying to figure out. So we have a particular record. We're confined by the record in this case. Judge Jones made this decision at a particular time and place. And we've now had subsequent developments, which may have a very dramatic effect on the overall outcome of the project, but might not have an effect on the appeal that's before us today. I'm trying to figure out what the scope of our record is. I understand there are developments. I'm concerned about those developments. But you're going to file a separate suit no matter what we do here, right? Unless the only thing that you can get out of today's hearing that would moot that would be if we decided that the injunction had to issue, that Judge Jones was wrong in issuing the injunction, in not issuing a permanent injunction. And that would moot your second suit, wouldn't it, if we issued that? That's correct, Your Honor. Or if the United States decided to do what we think is required, which is pause construction to undergo consultation under the ESA. Okay. But is there evidence that you're going to be submitting in the suit to come that is not in this record? Your Honor, I think the listing itself is not in this record. Okay. The information in the listing, much of it is. And I think the Court can take notice of the fact that the listing occurred because it's in the Federal Register and it corroborates. But things are going on on the property, right? So things could have happened to the Dixie Valley Toad, DVT, I guess, which to be distinguished from deep vein thrombosis, the Dixie Valley Toad could have been injured with what's going on. And so that can be a very different case, right? That's correct, Your Honor. And so we don't know any of that. We can't consider any of that. We have to consider the Dixie Valley Toad back then, right? That's correct, Your Honor. And we are not putting ESA claims before you. We are arguing with respect to the Toad NEPA claims. Is construction ongoing on the site? Yes. And the ESA determination has not affected construction at this point? It's puzzling why it hasn't. It absolutely should because the expert agency has determined that this very project is likely to cause the extinction of an endangered species, which is highly unusual. But the easy answer is it hasn't stopped construction. Correct. Did Fish and Wildlife issue the same warnings about the effect on the toad, in this case, as it has in the ESA? I read the ESA ruling, and it's pretty direct there. Did Fish and Wildlife use that same direct language elsewhere in the record? Yes, Your Honor. And I think ORMAT has conceded in their briefing that the listing repackages what Fish and Wildlife Service already presented. Well, the good news and bad news is if there's a new lawsuit and it comes here, they ask the panel that heard the first case if we want to get it as a comeback case. So we may see you again, depending on what happens here and what happens there. Did Fish and Wildlife oppose this project? My understanding is yes, Your Honor. Your understanding? Do we have something in the record? I'd like to be able to take your word for it, but I would feel a lot more comfortable if I had some paper. Yes, we have their extensive comments in the record. And respectfully, I know this is an awkward aspect of splitting time. Mr. Lake is speaking to the toad, and I represent the tribe. Okay. Thank you. And so to cut to the chase on the tribe's claims, not only is the springs and the directly adjacent uplands important to the toad, it's been a sacred site to the tribe for thousands of years, and that's well documented. And so a fundamental mistake that was made by agency in this case is to conceive of the sacred site as strictly the surface water. But, in fact, the surface waters are like the altar of the church. They're the source of the healing and direction, but the surrounding areas are equally important to the religious ceremonies and practices. Those are like the pews and the walls of the church, key parts of their religious experience. So can you address Navajo Nation versus U.S. Forest Service, an en banc case in this court, where the Ninth Circuit held that a substantial burden is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a government benefit or coerced to act contrary to their religious benefits by the threat of civil or criminal sanctions? And so does that case undercut the likelihood of success on the merits of your RFRA claim? No, Your Honor. That case was much different in that it was a huge area that was at issue, and the court found that there were not direct physical impacts to the ability to carry out the religious ceremonies. To the legal point, we meet the coercion prong, the Yoder test. The key aspect of that decision in Navajo Nation is that there has to be coercion by the government to violate religious beliefs, and we have that here because the tribal members, if the project is constructed on their sacred site, will not be able to carry out the religious practices. As the declarant, Roshan Downs, the Tribal Historic Preservation Officer stated, they'll be forced to pray to the geothermal plant instead of their origin site, Fox Peak. Footnote 25 in Navajo Nation is really helpful. There, the court stated that a law permitting Indians to use only recycled wastewater in their religious or healing ceremonies would likewise constitute a substantial burden on their religious exercise. And that's what we have here. We have a government action that's forcing the tribe to, instead of the sacred, unharmed waters of the spring, to use the waters as affected by the project and not to be able to access key areas for camping ceremonies and other parts of the religious exercise. They're detailed in the declarations of Tribal Elder Ashley George and elsewhere on the record. I mean, that may be a correct reading of what substantial burden means if we didn't have Navajo Nation. But what Navajo Nation says is coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions. So even it's that second part, where is the coercion through the threat of civil or criminal sanctions? I understand you are. I'd ask the court to also look to Guam v. Guerrero, which Navajo Nation states is consistent, which says that's one way in which coercion can occur. And also, as a practical matter, if the project is built and the tribe seeks to access these areas that are power plants, it will then face the threat of civil or criminal sanctions. Importantly— Why will it face criminal or civil sanctions? Because the project will become the private property of ORMAT. They are building a private project on public land. Right, that's the way the permitting—but how will then the tribe face civil or criminal sanctions? Well, so some of the infrastructure is located on the sacred site. If the tribal members sought to access those very areas— Correct. —try to breach the plant or something, then they might be subject to civil. Right. How close is the plant going to be to— is there like a particular focal point where the activities normally take place near the hot spring, and how close is the facility going to be to that area? What does the record say on that? The second declaration of Roshan Downs, which is 3 SCR 610 to 613, is a helpful resource. It describes the extent of the site and the activities there. There's also a good map of the wetlands at 2 SCR 513 and 518. And what it shows is there's a complex. There's springs of various temperatures that Mr. George describes his family going to, camping on the surrounding uplands, viewing Fox Peak in the night sky, and mixing waters of the different temperatures to attain different spiritual outcomes or benefits. So I think you also took—considered a problem with the district court of not applying the sliding scale is what I think your claim of error was. And my question would be if the district court had strictly applied the sliding scale variant of the winter test here, would it have changed the outcome given that the district court found the balance of hardships tipped sharply towards ORMAT after the 90 days? It could have, Your Honor, in part because that finding is contested in this appeal, and it doesn't lack any basis in the record. Even ORMAT says there's no basis for the 90 days. They asserted that any delay would cost them $30 million at the time of the argument, and there was no basis for the 90 days. So our position is that under either standard, the sliding scale standard, or the others, we prevail. And I'd like to preserve some time for Mr. Lake if there are no further questions. That would be fine. Thank you. Good morning, Your Honors. Good morning. Scott Lake for the Center for Biological Diversity. I will be addressing the NEPA claims in this case and also the factual information regarding the Dixie Valley toad. I'd like to discuss the summary of the NEPA claims first, and then I would like to clarify a few points about the current state of the Dixie Valley toad and the emergency listing in response to Judge Bybee's question. So on NEPA, the basic issue here is whether BLM was required to prepare an environmental impact statement or an EIS. Put differently, this concerns whether its conclusion that the project's impacts would be non-significant is reasonable. And the NEPA implementing regulations that apply to this project provide very clear guidance on this point. They give a number of factors to consider. Among those factors are whether the action affects a unique geographic area, including wetlands or ecologically critical areas, whether the action's impacts are highly controversial, whether the action involves unique or unknown risks, and whether the action affects cultural resources and areas eligible for listing on the National Register of Historic Places. Now, regardless of the underlying technical complexities here, the NEPA claims can be easily resolved on this basis because all of these factors are present here, and BLM did not prepare an EIS. Specifically, the project impacts cultural resources, specifically the Pamu Sacred Site, which includes both the Dixie Meadows wetlands and the surrounding uplands. It impacts wetlands, which are an ecologically critical area and the only known home of the endangered Dixie Valley toad. It involves uncertainty and unknown risk in that BLM and ORMAC concede that the subsurface geothermal system is not fully understood. The toad's habitat needs are not fully understood. So can you just be a little more specific? I understand the background, but since the time is limited and we're up to speed on this, obviously you're asking us to reverse the denial of the preliminary injunctions. So if you prevail on that, then the project stops, right? Yes, Your Honor. All right, so that's what you want. Yes. So tell me specifically where the district court was wrong in denying the preliminary injunction. First, Your Honor, the district court was wrong in concluding or in its analysis of plaintiffs' success on the merits. That's the point I was just speaking to. As I mentioned, all of these significance factors are present here, yet BLM didn't prepare an EIS. That demonstrates the likelihood of success on the merits, as does the... So what they did prepare, there was, what, an EA and then a FONSI? Yes, the finding of no significant impact, yes. So you're saying that the fact that the EIS wasn't prepared, you're going to succeed on that? Yes, Your Honor. And as we also briefed, our claims under the Administrative Procedure Act also demonstrate a likelihood of success in that the agency is conceding here that it ignored directly applicable guidance and didn't offer an explanation for that deviation. Now, ORMAT and BLM have argued that, well, these policies aren't legally enforceable, but that's not the argument we made to Judge Jones. What we argued and what's required under this Court's precedent is that the agency consider directly applicable policies and if it decides that this is an appropriate circumstance to deviate from those policies, it explain its decision. And here, the agency didn't do that. And as Mr. Golding explained, the agency also violated RFRA by substantially burdening the tribes' religious exercise. And that's our ground for arguing that Judge Jones erred in his merits analysis. As Mr. Golding also mentioned, Judge Jones erred in his balancing of the equities. Judge Jones found that plaintiffs would suffer irreparable harm from construction. He did not reach the issue of irreparable harm from project operations, but given the timeline we're dealing with here, that is also an imminent possibility. According to the construction schedule presented in its opening brief, ORMAT intends to bring the project online for testing as early as October. Counsel, you've got limited time. Can you turn to some of the questions I asked about the new lawsuit that's coming? Yes, Your Honor. Do you have a specific question you'd like me to address? Well, I had questions for co-counsel Mr. Golding, but I would like to know specifically did Fish and Wildlife oppose this project? Yes, Fish and Wildlife opposed this project. What did Fish and Wildlife say? Well, Fish and Wildlife was part of the technical working group that BLM convened to evaluate the impacts of this project and develop a mitigation plan. And did they issue a biological opinion, or what did they issue? They issued comments on the project, which are included in the administrative record at 2 S.E.R. 351 to 356. Also, minutes of the technical working group meeting are at 376 to 377. It's also in the second volume of the supplemental excerpts. Fish and Wildlife Service's comments, as well as the other cooperating agencies, are also summarized at... What precisely did Fish and Wildlife say? Fish and Wildlife Service said that due to the lack of understanding of how the geothermal system works, and I'm summarizing quite a bit here, but due to the lack of understanding of how the geothermal system works, it's highly likely that there will be significant impacts to the Dixie Meadows wetlands and springs, and that this could, and this is the words of Fish and Wildlife Service I'm quoting now, could spell doom for the Dixie Valley toad. They also addressed the mitigation plan, stating that the mitigation plan was insufficiently developed and insufficiently enforceable in this case to prevent any significant impacts, and also rested on the incorrect assumption that once impacts occur, they can be reversed, and that's something that's never established in the record or in the EA or in the finding of no significant impact. And as Mr. Golding mentioned, a lot of this information is highly technical, but it's very concisely summarized in the emergency listing decision. So where even though the emergency listing decision itself and the fact of the listing was not before Judge Jones, this information was presented to BLM before the project was approved. Fish and Wildlife Service was on the record saying... But do you concede that there's going to be new information in the new lawsuit? Your Honor, I would say that the new information is the fact of the listing and the legal effect of the listing, and there is some additional information that wasn't presented, some developments that happened. No, we can't consider that now. Would you agree with that? I would agree that to the extent... I mean, that would be outside the record. To the extent that new information is presented, yes, I agree. However, Fish and Wildlife Service is on the record saying this project is likely to cause the extinction of the Dixie Valley toad, and that is not in the emergency listing. It's also in the comments they submitted prior to the project's approval. And unlike the cases cited where the agencies resolved their differences, that did not happen in this case, as is evidenced by the emergency listing and Fish and Wildlife Service's opposition up until the moment of approval. Can I ask you to address briefly the balance of equities, which is an independent factor in the winter test? Yes, Your Honor. Here the equities tilt strongly in favor of the tribe in the center, where the tribe is losing a highly important sacred site, losing an important part of its way of life, losing an important part of its spirituality, and the project is, according to the expert agency on the subject, likely to cause the extinction of a highly vulnerable species. ORMAT claims only pecuniary harm. ORMAT has claimed throughout this litigation that the result of a preliminary injunction would be the loss of $30 million in future revenues over a 20-year period. And they may have to abandon the project. I would submit that the ORMAT's point about abandoning the project is speculative, as they've presented no actual proof that that would be an outcome in this case. How could they do otherwise? That's exactly what you're seeking, right? You haven't proposed that. There's no halfway measure here for you, is there, counsel? At this point in the litigation, we're seeking a temporary pause on construction until the merits can be decided. Yeah, but your position is you can't put half the plant up and still not threaten the toad or violate the sacredness of the site. So to say that abandoning the project sort of overstates things just doesn't make any sense. Your Honor, if ORMAT prevails here and they can build the project, complete the project now that it's already halfway built, they can complete the project after the case is concluded and the legality is clear. And as ORMAT claims, there's a strong demand for renewable energy resources. It's hard to believe that that demand is suddenly going to evaporate. Well, isn't there something, though, if they don't complete the project by the end of December, that then they can't avail themselves to? I can't remember. Is it like the Powell? The Powell Purchase Agreement, Your Honor. Yes, that is not in the record as part of what the district court considered. Yes, Your Honor, and that speaks to the monetary harm claimed by ORMAT. The monetary harm flows from losing the Powell Purchase Agreement. And the reason that's the case is because the Powell Purchase Agreement allows ORMAT to charge above-market prices for power. ORMAT's claimed harm here is thus that if they lose the benefit of that Powell Purchase Agreement, they'll be subject to market rates, and that will result in less revenue. Well, what did the district court say about the public benefit? The district court cited generally the benefit of renewable energy resources, and that's actually something that the tribe in the center agree with. However, nothing in the record before this court establishes a public interest in or a compelling need for this particular project. There are renewable resources being built all across the state of Nevada, including by other projects by ORMAT. There's noónothing is presented here that speaks to the need to construct this particular project in this particular configuration on a tribal sacred site and in such a way that threatens the entire existence of the Dixie Valley Toad. Okay, I think we understand your argument, but I want to make sureógo ahead. Yes. I have one sort of procedural question. So this has been fast-tracked to us, and it doesn't feel very fast, but that's the way that the ship of the Ninth Circuit moves sometimes. In terms of timing of a decision, how important is itó are there any deadlines by which it would be really important to have a decision from this court? Because the difference between a short decision affirming or reversing the district court and a fully written, considered opinion could be a long time. So I'm just wondering, what's the timing? I'm going to give a classic lawyer's answer here, Your Honor, and say yes and no. The harm to plaintiffs increases every day that construction continues. So in terms of addressing the irreparable harm to the tribe in the center, the sooner the decision, the better. On the other hand, the real existential harms presented by this project are from the project's operation, and that would commence according to ORMAT as early as October. If we were to reverse Judge Jones's final order here on the preliminary injunction, would that moot the need for the second suit? It wouldóno, Your Honor. It would moot the need to seek preliminary relief on the additional claims. But all of the merits claims have yet to be briefed before Judge Jones. So the second suit would be brought, and we would be rebriefing the claims we're arguing here in addition to additional claimsó Is it likely that the second suit would be consolidated with this one? Yes, we intend to move to amend our complaint in the currently ongoing case and add those claims to that case. Thank you. Okay. We've taken you over, but we had questions, so that's good. Okay. I'll give your side a total of two minutes for rebuttal. Thank you. All right, and you decide while the other side's talking how you want to spend it. Okay. We're ready to hear fromóI'll find out who I'm going to hear from. Technically the appellant. Your Honor, may it please the Court, my name is Dessa Reimer. I'm here on behalf of ORMAT Nevada. To your first point, yes, we concede that our initial appeal is moot in this case because your colleagues issued a stay of the injunction below, and construction is proceeding. So as a result of that, you still didn't construct for how many days, like 60 or something like that? There's about a 45-day delay before construction began after the issuance of the notices to proceed in December. Correct. Okay. So can you kind of update us on what's going on right now, and are you on track to finish in December? Yes, the project is on track to be online at the end of December. Currently that 10-acre site for Phase I of the power plant has been graded and cleared. Foundations have been laid, and the next step will be to construct or assemble the actual power plant. There's also the power line, which has not yet begun construction, but none of the parties have argued in particular about the impacts of that power line that heads north out of the valley. So the emergency listing of the Dixie Valley Toad, does that recent emergency listing support plaintiff's argument that the BLM's finding of no significant impact did not meet NEPA standards, and if so, why not? No, Your Honor, it does not. I think we definitely have to admit that the Fish and Wildlife Service has a different opinion. They submitted that opinion to the Bureau of Land Management in comments on the environmental assessment. However, BLM provided detailed responses to those comments as part of that EA process. The major area of disagreement is not necessarily on the habitat needs of the toad or the biology of the toad, but rather on the hydrology of the underlying system. And as the Bureau of Land Management pointed out in its response to comments, the Fish and Wildlife Service relied on studies that did not take into account the site-specific information that had been collected by ORMAT over the course of the last 10 years that delineated the source of the geothermal fluids, which are not in a particular fault that the Fish and Wildlife Service cited as the source of the springs. Your Honor, we ask that the court affirm the district court's denial of a preliminary... Can I ask a question just factually about the construction? How close will the actual facility be to the hot springs that they have deserted or used for sacred rituals? Thank you, Judge Collins. Yes, if you look in our brief, we actually have a figure of a map that shows the exact location of the Phase I power plant in juxtaposition with the springs. It's at ER-115, that map. It's approximately a half a mile from the nearest spring or a mile and a half away. One of your honors asked about whether there's an impact to the toad now from ongoing construction. But before we get to the toad, I mean, that's awfully close. And this would be a fairly large and I assume an operational noisy plant. And is it fair to say, I mean, we don't have in... I mean, suppose you were building a large, you know, noisy factory, you know, a half mile from the Grotto at Lourdes, if we're in the United States, say. Could you reasonably say that that doesn't have a significant impact on the religious activities at that site? Under that hypothetical, Your Honor, I'm not certain. But in this case, what we're talking about is a power facility that at its noisiest, and there is noise mitigation that was required by the Bureau of Land Management, will be 65 decibels. So that's approximately what you could expect in a normal office environment. It is on a landscape that's already been disturbed. We're not talking about a wilderness study area. These are multiple-use public lands where there's a county road. There's also a power line that currently bisects the springs, 85-foot-tall high-voltage power line, and a gravel pit that's directly adjacent to where the Phase I plant has been planned. That plant was actually moved directly adjacent to the county road and as far from the springs as possible to allow for still – development of the resource. And that was part of the mitigation measures that BLM put in place to minimize the impact to the tribe. But it has to minimize it to the degree that there's no significant impact, not that you've just done the – because you didn't do the environmental impact statement. Correct. BLM, in its judgment, given the context in this landscape, and we're talking about a 35-foot-tall facility, so that's shorter than your average house, that – the BLM determined that, in this multiple-use landscape where there are other activities, that would not fundamentally change the nature of the viewshed. It's not an obstruction to Fox Peak. From the springs, it may be visible, but that's very different from obstructing the view of Fox Peak. I think I would also make the point that there are uplands around these springs that can still be maintained and used for the tribe's religious purposes. This one 10-acre site was never part of the sacred site's designation by BLM in 2015. And certainly the tribe had an opportunity under BLM and Interior's policies to request that that site be extended to a larger area. The fact that it's not part of the site doesn't mean there's a significant impact. I mean, that was my point about the Lord's Grotto example. If you put something right next to something, it can have a significant impact on the religious value of that land. And the district courts seem to just say, well, it's not in the site, and they did some measures to mitigate it. And I'm not sure that adds up to an adequate consideration of whether there was a significant impact. Your Honor, I would submit that the district court did not abuse its discretion in determining that the agency's decision on that point was not arbitrary and capricious. What about Navajo Nation? I asked a question of the tribe, and Judge Bivey followed up on it. What do you see as the impact there? I mean, are they threatened of civil or criminal sanctions? No, they aren't, Your Honor. Their attempt to demonstrate that potentially they could need to use this particular 10-acre site for their religious practices,  And so Navajo Nation is binding precedent on this court at this point, and there is no threat of civil or criminal sanctions that would put this within the gamut of the Religious Freedom Act claims. Does Navajo Nation resolve the question whether the substantial burden case law that's been developed in the Vailupa context is relevant to construing the phrase substantial burden in the RFRA context? I'm sorry, Your Honor, I didn't hear the first part of your question. Does Navajo Nation resolve the question of whether the case law construing the phrase substantial burden in the Vailupa context applies to the construction of substantial burden in the RFRA context? Navajo Nation, I believe, does resolve that. It relied on the Ling case and certainly applies a different definition of substantial burden than in those institutionalized person cases. With my remaining time, I'd like to talk about the balance of harms and what an injunction would mean to ORMAT here. We're talking about the potential loss of $30 million on an existing power purchase agreement, and it's not only the monetary loss. It's the 20-year life of that power purchase agreement, which gives certainty in a fluctuating energy market for projects like this to move forward. The amicus brief of geothermal rising makes that point, that renewable energy projects depend on these power purchase agreements for financing and to move forward. So loss of this 12-megawatt power plant, and if it can't be brought online by the end of the year under this power purchase agreement, will lead to that ORMAT having to reevaluate whether it can move forward with this project. Judge Jones correctly weighed that against the harms to the plaintiffs, which he noted, and in this case, his weighing of those harms was not an abuse of discretion. What about the sliding scale argument that is brought up? Judge Jones had no need to apply the sliding scale here, where he found that the balance of harms tipped sharply against an injunction after 90 days. So he had, in this case, no need to apply it. But he was wrong about the 90 days, according to our court, I guess. The question of the 90 days, he did not specifically make a finding as to whether ORMAT would be irreparably harmed after 90 days, and that's why we brought our initial appeal to this court. But it's not particularly relevant when you look at the balance of harms as to what happens if this project can't be constructed by the end of the year. Thank you, Your Honors. I'll cede the rest of my time to court counsel. Do either of my colleagues have any questions? I think you're over time. Yeah, so you've used your time. Thank you, Your Honor. Thank you. All right. Good morning. Good morning, Your Honors, and may it please the Court, Michelle Melton on behalf of Federal Appellees. Can you hear her okay, Judge Collins, or do you need her to get a little closer? A little closer would help. My apologies. My name is Michelle Melton. May it please the Court? Use your outside voice. On behalf of Federal Appellees this morning, apologies. I have some prepared remarks this morning, but I'd like to just quickly address a few points that I heard and address any questions the Court has. Judge Collins, to your loop-up point, the difference between those two, you are correct that Navajo Nation, if I understand your question correctly, does not actually address the RLUIPA substantial burden test. With respect to RFRA and RLUIPA in the incarcerated person's context, the test is the same because of the amount of coercive control that the State or the government is exercising against the prisoner by virtue of his imprisonment. The exercise of control over the prisoner's liberty and property is sufficient to constitute a substantial burden. But we do think that there is a significant difference in the RLUIPA property rights context. In those cases, the substantial burden is because the government is already using its coercive power to tell the applicants in that case what they can and cannot do with their property. That is simply not an issue in RFRA cases involving the government's use of its own land. Just turning, if I may, to the narrow issue on review this morning in this interlocutory appeal is about whether the district court abused its discretion in declining to enjoin construction of this project. I heard a lot this morning about Fish and Wildlife Service's findings. They did not make any findings about construction. There's nothing about that in the listing. As I understand their concerns, construction is not their concern. They are more interested in operations and the threat that operations poses, and I would submit that this case can be resolved on the merits before construction commences. The district court and all of the parties have agreed to resolve this issue expeditiously, and we do believe that this case can be briefed and decided before December when operations commence. So, okay. You told us why we shouldn't be worried. I guess I didn't quite follow what you just said. Apologies, Your Honor. The preliminary relief the plaintiffs seek here is really about construction. This is an interlocutory appeal. The issue is whether to endure. And if we affirm the district court, it will continue unless the next lawsuit is. Yes, Your Honor. There could be an injunction on that, but we don't know. Your Honor, that's entirely plaintiffs' prerogative. But the point that I am simply trying to make, and I apologize for making it more complicated than it needs to be, is that the construction is not, there is no evidence in the record that construction harms the toad. And, in fact, the record has lots of information suggesting that construction will not harm the toad. Appendix J contains specific environmental protection measures that specifically discuss how and why the toad will not be harmed during construction. Fencing is required to protect the wetlands. There is a biological survey that was conducted before construction commenced by a qualified biologist who could be called back if the need arises. There is no construction in the wetlands themselves, and the record demonstrates that the Dixie Valley toad stays within 46 feet of the wetlands. Well, let's say they didn't file, well, let's say they're not going to file another lawsuit. Do we completely, we don't have to worry about whether operation of the plant will hurt the toad? I would submit that this case can be decided on the merits before the power plant will turn on at the end of December, and, therefore, the court need not consider those issues. So, pursuant, you're saying we should limit our consideration to the preliminary injunction and what harms construction would pose? That is what the district court did, Your Honor, and I would submit that was not an abuse of discretion based on the record. So the ruling would essentially be without prejudice to renewing with respect to construction? When that, if and when that comes? I mean, with respect to operations? You could do that, Your Honor, and I would suggest that this case can be briefed and resolved on the merits before operations do commence. And is the question of operations also, was that also part of the original lawsuit? Yes, Your Honor. There's only one NEPA document. There's only one NEPA. There's not going to be subsequent NEPA. And the district court, you think, has reserved that question. You've agreed with counsel that that question is still on the table and will be resolved in future hearings before the court? If I'm understanding Your Honor's question correctly, whether we agree that construction does not harm the toad, I think the answer is yes. No, I understand that you don't agree on that, but you do agree that if you were to go forward that operations is still in question and still a question to be decided by the court, by the district court. Yes, Your Honor. I would assume that they're seeking, I believe their complaint seeks permanent injunctive relief of the project as well. And so that would be an issue that the court could resolve if it decides that plaintiffs prevail on the merits, which we do not, to be clear, we do not think is the likely outcome here. So, but if we didn't say anything, I guess what we're saying, you know, lawyers are lawyers. So let's just say we affirmed the injunction and then you're all back in district court and they're saying, okay, well, the appellate court just said that, affirmed the injunction relative to the construction, and then you get up and say, oh, no, no, no, no, that wasn't the, the appellate court just affirmed the injunction and said there would be no harm. So are, I think what Judge Bybee was trying to say are you, if they claim later that operation would be a problem, are you going to say that if we affirmed you that, that we've already ruled on that? No, Your Honor. That's, I apologize for not being clear. My only, my only point was that for all practical purposes, construction is the only harm before this court. It is true that they, they are alleging that operations is also a harm, but that depends on the district court not being able to resolve the merits of this case before December. And every party in the district court has reiterated that they are committed to resolving this case expeditiously so that the case can be resolved before operations commences to give certainty to both sides. Well, but if, let's just say hypothetically that we thought that operations will affect the Dixie Toad and it wasn't properly handled in the NEPA part of this, and so can that be a basis to reverse? That would solely go to the likelihood of success on the merits, and I think that you would have to also consider the other winter factors. Likelihood of success on the merits, as Your Honor is well aware, is only one of those factors. We also believe that. So the merits, when we consider success on the merits, that does go to construction and production, does it not? That's correct, Your Honor. Yes. Okay. I apologize for not being clear. I was speaking solely about the harms, and I should have made that clearer. We do think that regardless on the merits, the district court was correct, that there is no likelihood of success here, starting with their NEPA claim. They raised a series of NEPA arguments, but as you heard this morning, their claim ultimately boils down to whether the BLM took a hard look at the project's impacts and reasonably concluded that the project, including the Aquatic Resources Monitoring and Mitigation Plan, which I'll refer to as the ARMP, would not have significant impacts. That decision was not arbitrary and capricious and was supported by the record before the agency at the time of decision. I just want to be really clear, this was not a slipshod EA. This was not a fly-by-the-seat-of-the-pants EA. It was not incomplete. To the contrary, BLM was eyes wide open about possible harms, did discuss the impacts that the project could have on the springs and on the tribe's religious practice. But the ARMP was designed to be flexible enough to accommodate a listing decision and to accommodate changes that may occur for reasons that nobody here has discussed, such as climactic changes or other changes in land use. And I will note that the decision record here does have a specific point noting that conclusions of the Fish and Wildlife Service's 12-month finding will be incorporated through the adaptive management practices outlined in the ARMP. So BLM was aware.  based on not only the 46-day flow test conducted by ORMAT, the prior drilling conducted by ORMAT, all of the information about the region's hydrology done that goes back decades, as I understand it. So there's ample data in the record about the local hydrogeology, existing conditions at a variety of springs sufficient for BLM to assess the magnitude and significance of any possible changes. And I just want to be really clear. What is the size and visual impact on the tribe's practices? Because it's very close and it's large and it will be noisy. How is that not a significant impact? Well, Your Honor, if you take a look at Section 3.11 of the EA, BLM takes a very specific agency policy approach to assessing significance. It classes, it characterizes specific areas by class, and it assesses whether a visual change will be significant for that class. And here it said that BLM concluded that sensitive receptors will see the project, but it will not dominate the landscape. And in BLM's view and according to BLM's policy, that is not a significant impact. And I would submit to you that the agency was not arbitrary and capricious in so concluding. What about noise impacts? Will it alter the current level of noise in the area? I do believe that BLM considered the noise impacts, which it said would primarily be from construction, but it concluded that those impacts were temporary and therefore would not be significant. You just told us we should limit our consideration to construction, and then you say it's temporary so we should ignore it. I'm kind of a little confused by that. Well, the question is whether the impact is significant for the purposes of preparing an EIS. And I would submit to you that when I was – again, I apologize to the Court for not being clear. When I was talking about the construction, I was really talking about the harms that plaintiffs are alleged to have suffered. So is it your position that the listing of the Dixie Valley toad only suggests that the toad could be harmed by project operations and not by construction? Yes. And what do you base this distinction on? Well, all of the comments – as Your Honor has pointed out, the listing decision itself is not part of the record. But as you've heard this morning, and I agree with all of my colleagues who have said this, Fish and Wildlife Service did present its concerns to BLM, both through comments that are in the record – that's in Appendix G – as well as in technical working group meetings. So, of course, it was not a surprise to BLM that Fish and Wildlife Service felt this way. None of those comments and none of the issues raised ever concerned construction of this project. They were always and solely about the long-term impact of project operations on the springs because of the concern that the BLM and ORMAT did not have a sufficient understanding of the fault system 5,000 feet below the surface. Okay. Do either of my colleagues have any additional questions? I want to ask the same question to you that I asked of opposing counsel about the timing of our decision. Are there any particular important dates coming up by which it would be important or necessary for you to have a decision from this Court? Your Honor, I would defer to this Court on that. Of course, we haven't talked about it, but BLM and the Fish and Wildlife Service are currently engaged in a consultation process, and that process may itself impact what this project looks like moving forward. But as far as I can tell, the timing of the decision will not impact that consultation process or anything. But is it important to get a decision sooner rather than later so that if necessary you can get back to the district court? So if we did anything other than reverse the denial of a preliminary injunction, so granting the preliminary injunction will just stop everything. But if we were to affirm the denial of the preliminary injunction, then the district court's got to have additional proceedings, and it's got to have enough time to do those proceedings, and the critical dates coming up are going to be in December. So the timing of this Court's decision, if we were to issue this at Thanksgiving, is going to make a big difference than if we issued it by the 4th of July or, let's say, by Labor Day. The most that I can say, Your Honor, is that sooner is always better than later, but BLM and the Department of Interior generally do not have a specific position on timing. I will say that if the Court is inclined to grant the — to overrule the district court and grant the injunction for the full period, we would ask that you not enjoin the monitoring that is currently ongoing. That is very important to both BLM and the Fish and Wildlife Service. Thank you, Your Honors. We ask that the Court affirm the denial of the injunction beyond 90 days. Excuse me one sec. Judge Bybee, did you have a chance to ask that question on timing or Matt, or did you? I didn't. I've only asked it to one party. Do you want to ask it? Yeah, I'd like to ask it. I didn't ask it of the tribe either, so if the tribe and Ormatt have got to want to weigh in on that. Okay, so, all right, I'm flexible on, so maybe when you sit down. We're going a little over anyway that you look at it, so if Counselor Ormatt wants to come up and answer Judge Bybee's question on timing. Your Honor, the district court proceedings will continue. The administrative record has been submitted by the Department of Interior below, and so we will be setting a briefing schedule, and that will move forward regardless of the timing of your decision on this interlocutory portion. And those proceedings are related to the operations, to whether an injunction should issue against operations? Is that what's at stake there? They go to the merits of the case below, which at the close of which Judge Jones will have the prerogative to either issue a permanent injunction if he finds error, and that could include operations. Okay. Correct. Thank you. That was helpful. Okay. All right, so we're on rebuttal, and so I think the tribe is moving to the podium, right? All right, and so if you and Mr. Golding, if Judge Bybee, did you want to pose that question? If the tribe would like to weigh in on that question, I'd love to hear your answer. Your Honor, would it be okay to answer your question and then begin my rebuttal? Just answer the question. I'll give you all the time and flexibility here. This is one case about construction and operation, both of which harm the tribe. And so there's no segregation as to the merits. BLM approved the whole project, and there's nothing to prevent ORMAT as soon as they get done with construction, starting operation. And so this will not just be resolved by proceeding quickly on the merits at the district court. That's just as a practical matter. And also, the district court judge, his reasoning for the 90-day P.I. was to quickly come up to this court and ask for direction as to success on the merits. And so that's of extreme importance to the tribe, because we would hate to see the district court to interpret the affirmance of a denial of a P.I. as the tea leaves that we don't have strong claims on the merits. But it also sounds like things are moving forward in the district court, notwithstanding the fact that the appeal is here. Correct, Your Honor. Okay, go ahead then. Judge Collins asked about how-repeatedly asked how close this project will be. It's really important to understand ORMAT spoke about one aspect of the project, which is the Phase I 10-acre power plant. However, there are wells that appear to be from the map, which we provided in the reply brief, that are about 500 feet from springs. So it's very close. Moreover, there's two major plants being proposed that are all part of what must be considered for success on the merits, totaling 32 acres. There's a 75-foot-tall tower. These wells include huge drilling rigs that go into the ground. So this is an enormous operation. It's not one 10-acre area. ORMAT's counsel referenced a designation of the site. There's no such designation in the record, and that really shows the flaws in BLM's- No designation of what? Sorry, there's no map. There's no instance or record of BLM saying, here's where the sacred site is and here's how we protected it. To the contrary, what we have is years and years of the tribe saying, you're building a power plant on our sacred site, and the BLM ignoring that and never figuring it out. I understood counsel to have argued a slightly different point, which is that there are other sacred sites that have been designated in surrounding areas, but that the tribe had an opportunity to ask that this be designated as a sacred site and did not do so. Perhaps I misunderstood her argument, but I would note that BLM concedes that this is a sacred site. That's a term of art for purposes of application of NEPA and NHPA, and that's in the memorandum of agreement. And they concede that the site is not just limited to the springs. They just failed to evaluate the impacts to the site. With respect to harm to the toad, it's not correct that construction risks no harm. At 1 ER 344, Fish and Wildlife Service raises the very reasonable concern that construction so close to the habitat of a species about which there's very little data will crush the toads or otherwise impact them. And finally, I'd note that... It was addressed in the EA and other documents by construction of a fence that would be of a particular size to prevent the toads from going into the construction site. I think there's limited fencing around some of the springs, but not the whole wetland complex. They also discussed looking for the toads and trying to move them, but the toads are this big, and there's huge construction ongoing, including gravel mining. How big are the toads? They're about this big. They're small. An inch and a half round? I'd say they're about the size of a quarter or so. Okay. They're small. And there's a picture in the record. Finally, a council for the United States conceded that BLM was aware of these significant concerns and the risks inherent in this project raised by not just Fish and Wildlife Service, but several other sister agencies. And that is proof positive they should have prepared an EIS. Thank you. All right. Any additional questions by my colleagues? There do not appear to be. Thank you, everyone, for your arguments today. And this matter will stand submitted. Thank you.
judges: BYBEE, CALLAHAN, COLLINS